UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DAVID S. MAURER                              CIVIL ACTION

VERSUS                                       NO: 13-5450

TOWN OF INDEPENDENCE,                        SECTION: R
LOUISIANA, *ET AL.*

### ORDER AND REASONS

Two sets of defendants move under Federal Rule of Civil Procedure 12(b)(6) to dismiss all of plaintiff David Maurer's claims against them.  The Town of Independence and the Mayor of Independence, Michael Ragusa, filed the first motion.[1]  The Independence Volunteer Fire Department (Volunteer Department) and five members of the Volunteer Department's board--Jeremy Baham, Eric Anthony, Jonathan Tallo, Christopher McKinney, and Anthony Parrozzo--filed the second.[2]

While these motions to dismiss were still pending, Maurer moved for leave to file a second amended complaint.[3]  The Magistrate Judge denied the motion for leave,[4] and Maurer appealed to this Court.[5]

---

[1]    R. Doc. 43.

[2]    R. Doc. 44.

[3]    R. Doc. 80.

[4]    R. Doc. 88.

[5]    R. Doc. 90.

For the following reasons, the Court grants Maurer's motion for leave to amend and grants the motions to dismiss in part and denies them in part.

## I.  PROCEDURAL BACKGROUND AND MOTION FOR LEAVE TO AMEND

This section 1983 and state law defamation and "Whistleblower Law" suit concerns plaintiff David Maurer's termination from his position as the chief of the Volunteer Department.

### A.  Motions to Dismiss

The motions to dismiss now before the Court are second round motions to dismiss by the Volunteer Department defendants, Independence, and Ragusa.  At issue in these motions is whether Maurer has successfully re-pled three claims previously dismissed by the Court: (1) a section 1983 due process claim against the Volunteer Department defendants, Independence, and Ragusa; (2) a state "Whistleblower Law" claim against Independence and Ragusa; and (3) a state law defamation claim against Ragusa.

The Court's order dismissing Maurer's original complaint held that as an employee of a volunteer fire department, Maurer was not entitled to the procedural protections of the Louisiana Firefighter Bill of Rights, La. Rev. Stat. § 33:2181, or the Louisiana classified civil service system, so he had no property

interest in his employment.[6]  Thus, the Court dismissed his Due Process claim.  The Court also dismissed Maurer's state law "Whistleblower Law" and defamation claims because he had failed to allege elements essential to each cause of action.  The Court granted Maurer leave to amend his complaint, and Maurer filed an amended complaint.[7]

The amended complaint seeks to rehabilitate Maurer's due process claim by providing two new justifications for his alleged property interest in his employment.  First, Maurer contends that although the Volunteer Department was his *nominal* employer, Tangipahoa Parish, acting through its special district, the Fire District, was Maurer's *de facto* employer.[8]  He alleges that Tangipahoa, acting through the Fire District, "has the right to control all of the volunteer fire departments . . . because of its authority concerning personnel and finances."[9]  He claims that, as a result, he "meets the definition of 'fire employee' in the Firefighter Bill of Rights because he is a person employed in the fire department of a fire protection district."[10]  Second, he argues that he is entitled to the protections of the Louisiana

---

[6]    R. Doc. 34.

[7]    R. Doc. 39.

[8]    *Id.* at 49.

[9]    *Id.* at 52.

[10]   *Id.* at 54.

classified civil service system, again relying on his "de facto" employer argument to support his position.  The amended complaint also contains more detailed factual allegations regarding the allegedly defamatory statements made by various defendants.

### B.  Leave to Amend

While these motions to dismiss were still pending, Maurer moved for leave to file a second amended complaint.[11]  The second amended complaint primarily seeks to add detail in support of Maurer's Due Process claims.  It also deletes Maurer's stigma-plus-infringement claim and deletes his defamation claim against all defendants but Ragusa.[12]

Leave to amend should be "freely give[n] . . . when justice so requires."  Fed. R. Civ. P. 15(a)(2).  A district court may refuse leave to amend if the filing of the amended complaint would be futile, i.e., "if the complaint as amended would be subject to dismissal." *Varela v. Gonzales*, 773 F.3d 704, 707 (5th Cir. 2014) (quoting *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 208 (5th Cir. 2009)).  The futility standard is functionally identical to the 12(b)(6) standard. *See id.* (citing *City of Clinton v. Pilgrim's Pride Corp.*, 632 F.3d 148, 152 (5th Cir. 2010)).

---

[11]    R. Doc. 80-1.

[12]    *Id.* at 1.

4

Because the futility standard and the 12(b)(6) standard are functionally identical, the Court addresses the amendment question by assessing whether the proposed second amended complaint can withstand the arguments made in defendants' motions to dismiss under Rule 12(b)(6).  It can.  *See* Section III, *infra.*  Thus amendment is not futile.  The Court grants the motion for leave to amend, and for the remainder of this opinion, cites to Maurer's second amended complaint.

## II.  FACTUAL BACKGROUND

### A.  Parties

Plaintiff David Maurer is the former chief of the Volunteer Department.  After he was fired, he sued four groups of defendants--thirteen defendants in all.  First, he sued Independence and Independence's mayor, Ragusa.  Independence is a political subdivision of Louisiana.

Second, he sued the Volunteer Department and five members of its board of directors: Baham, Anthony, Tallo, McKinney, and Parazzo.  The Court refers to these six defendants together as the "Volunteer Department defendants."  The Volunteer Department is a domestic corporation that provides fire protection services to Independence and the surrounding area.

Third, Maurer sued Tangipahoa Parish Rural Fire Protection District Number 2 (Fire District), together with two members of

the Fire District's Board of Commissioners, Nicholas Muscarello and Carlo Bruno, and the Fire District's administrator, Dennis Crocker.  The Fire District is a political subdivision of Louisiana.

Finally, Maurer sued Tangipahoa Parish Government, which is also a political subdivision of Louisiana.   Maurer sued all of the individual defendants in their individual and official capacities.

**B.   Alleged Facts**

The second amended complaint alleges the following facts relevant to the current motions to dismiss.

Maurer began working as a firefighter for the Independence Fire Department in October 2009.[13]  At the time, Independence Fire Department and the Volunteer Department jointly provided fire protection services for Independence and the surrounding area.[14]

In September 2012, Independence and the Fire District decided to close Independence Fire Department and hire the Volunteer Department as the exclusive provider of fire protection services for the area.[15]  The firefighters employed by Independence Fire Department were to be terminated by

---

[13]    R. Doc. 80-4 at 5.

[14]    *Id.*

[15]    *Id.* at 7.

Independence and then immediately rehired by the Volunteer Department.[16]

Dennis Crocker, the fire chief of Independence Fire Department, became the administrator of the Fire District. Crocker asked Maurer to be the fire chief of the Volunteer Department under the "new regime."[17]  Maurer accepted, and in December was officially confirmed as the Volunteer Department's fire chief.[18]

Almost immediately, Crocker and Maurer began to disagree. Crocker "continued to act as if he had supervisory authority over [Maurer]," "frequently [coming] to the station and often call[ing] Maurer] telling [him] how to do his job."[19]  In January 2013, during his second month as chief, Maurer learned that Crocker had been "undermining" Maurer as fire chief in conversations with other firefighters.[20]  Maurer complained about Crocker to Mayor Ragusa and Nicholas Muscarello, a member of the Fire District Board, but Crocker's interference continued.[21]

---

[16]     *Id.*

[17]     *Id.*

[18]     *Id.* at 9.

[19]     *Id.* at 11.

[20]     *Id.* at 16.

[21]     *Id.* at 16-17.

7

That same month, Maurer learned that Crocker had failed to pay several of the fire department's bills at the end of his time as fire chief.[22]  Several months later, a newspaper ran a story about the Volunteer Department's failure to pay its bills.[23] When Crocker asked Maurer why he had contacted the media, Maurer responded that he had only responded to a press inquiry and that he would not "lie to cover up what was being done to [the Volunteer Department]."[24]

Crocker and Maurer clashed again when Maurer refused to hire Crocker's son, Andrew, at the Volunteer Department.  Maurer learned from the Board of Ethics that Andrew, as the son of the Fire District's administrator, could not work for the Volunteer Department.[25]  But Crocker continued lobbying Maurer to hire Andrew, even after learning of the Ethics Board's decision.[26]

Finally, Crocker and Maurer disagreed about Maurer's part-time employment with Hammond Rural Fire Department.  In late January, Crocker told Maurer that he had received a complaint about Maurer's employment with Hammond and told Maurer that he could not work part time for Hammond and also be chief of the

---

[22]    *Id.* at 15.

[23]    *Id.* at 20.

[24]    *Id.* at 21.

[25]    *Id.* at 19.

[26]    *Id.* at 20.

Volunteer Department.[27]  Maurer told Crocker that he would not make a decision on the matter without speaking to an attorney.[28]

Meanwhile, Maurer sparred with town officials over "compensatory time" that Maurer believed the town owed several firefighters.  After Maurer officially assumed his duties as fire chief, he approached Mayor Ragusa about "unpaid compensatory time owed to the firefighters who were formerly employed by the Town of Independence."[29]  Ragusa promised to "take care of it," but the issue went unresolved.

In April 2013, Ragusa told Maurer that the town was not going to pay the compensatory time.[30]  One month later, Maurer decided to not invite Ragusa or the Independence Aldermen to the Volunteer Department's annual "safety meeting/crawfish boil," because the firefighters were "upset with the Town officials about the compensatory time issue."[31]  The snub irritated Ragusa and the Aldermen.  Ragusa intimated that hiring Maurer as Fire Chief had created hostility between the Volunteer Department and Independence.[32]

---

[27]   *Id.* at 18.

[28]   *Id.*

[29]   *Id.* at 13.

[30]   *Id.* at 21.

[31]   *Id.* at 21-22.

[32]   *Id.* at 22.

9

Two months later, in June 2013, Ragusa asked Maurer to prepare an inventory of Independence town property used by the Volunteer Department.[33]  Before Maurer took over as chief, Crocker told him that Independence owned only a few items that the Volunteer Department used: a "thermal imaging camera," some furniture, and two Mack fire trucks.[34]  Maurer asked Independence Town Hall for information about Independence's property and was given only an asset depreciation report, which was "inaccurate, outdated, and incomplete."[35]  Still, Maurer attempted to create an updated inventory, which he submitted to Ragusa, noting that it still contained "some questionable items."[36]  Ragusa did not respond.

Around the same time, Ragusa asked Maurer about a $2500 check that the Volunteer Department had received and that Ragusa believed belonged to Independence.[37]  Maurer's version of events surrounding the  $2500 check is as follows.  The Volunteer Department had paid $2500 for Austin Davis, a former employee of the Volunteer Department, to attend the LSU Firefighting School, conditional on Davis remaining employed with the Volunteer

---

[33]   *Id.* at 23.

[34]   *Id.*

[35]   *Id.* at 24.

[36]   *Id.*

[37]   *Id.* at 23.

Department for at least two years.[38]  Davis left before the two years was up and thus refunded the tuition.[39]  Crocker, the Volunteer Department fire chief at the time, deposited the money in the Volunteer Department account, having stated "the funds were originally budgeted for the fire department and if we give it back to the town we will never see it again."[40]

On June 25, 2013, Maurer met with Ragusa and one of the Independence Alderman to explain what had happened with the $2500 check.[41]  Maurer showed the men copies of the bank statement and check, both of which showed that Crocker had been chief when the check was deposited.[42]  Maurer assured them that he understood the Volunteer Department owed the town money, and he agreed that the Volunteer Department would repay the $2500.[43]  Ragusa told Maurer "that was fine," and gave the department until the end of the year to repay the money.[44]

Nonetheless, that same day, Ragusa sent a letter to the Fire District stating that Independence intended to withhold money

---

[38]    *Id.* at 32.

[39]    *Id.*

[40]    *Id.*

[41]    *Id.* at 25.

[42]    *Id.*

[43]    *Id.*

[44]    *Id.*

from the Volunteer Department because Maurer had not been adequately fulfilling his duties as fire chief.[45]  Ragusa's letter accused Maurer of failing to respond to calls in the Independence area; failing to properly inventory and maintain the town's fire equipment; causing several firefighters to quit the Volunteer Department; and improperly depositing in the Volunteer Department account a $2500 check that belonged to Independence.[46]

A week later, on July 1, 2013, Crocker and Carlos Bruno, a member of the Fire District's Board of Commissioners, shared Ragusa's letter with Maurer and told him that the Fire District planned to investigate Ragusa's allegations.[47]  Bruno told Maurer that the Fire District would send a letter before starting the investigation.[48]  But when Maurer returned to the fire station, he discovered Crocker already there, pulling fire reports for the investigation.[49]  Thus learning that the investigation had begun, Maurer wrote to the Fire District "refut[ing] every allegation contained in Ragusa's letter."[50]

---

[45]    *Id.* at 26.

[46]    *Id.*

[47]    *Id.* at 27.

[48]    *Id.* at 28.

[49]    *Id.*

[50]    *Id.* at 29.

Several days into the investigation, Crocker came to the fire station unannounced and interviewed Maurer.[51]  Crocker did not read Maurer Louisiana's Firefighter Bill of Rights before the interview, nor did he record the conversation.[52]  During the interview, Crocker asked Maurer about the allegations in Ragusa's letter, and Maurer refuted each allegation and "presented Crocker with documentation refuting" each of the allegations.[53]  For example, when Crocker asked him about the $2500 deposit, Maurer showed Crocker the documents proving that Crocker was the fire chief at the time the deposit was made.[54]  Crocker, however, "refused to take the documents with him."[55]

On July 18, a Fire District committee met with Independence officials to discuss the Fire District's investigation of Maurer.[56]  Five days after that meeting, Volunteer Department board member Anthony Parrozzo stated, "All we are going to have to do is vote and he [Maurer] is out as fire chief."[57]  Maurer

---

[51]     *Id.* at 31.

[52]     *Id.*

[53]     *Id.*

[54]     *Id.* at 33.

[55]     *Id.*

[56]     *Id.* at 35.

[57]     *Id.* at 36.

believes that Parrozzo wanted to be fire chief, and wanted to use his close friendship with Crocker to replace Maurer.

On July 25, the Volunteer Department Board met.[58]  After the meeting, the Board told Maurer that they were placing him on administrative leave, with pay, pending the conclusion of the investigation.[59]  Maurer complained to Muscarello that he had never had an opportunity to defend himself against Ragusa's allegations before being placed on leave, but Muscarello declined to give Maurer any details about the ongoing investigation.[60]

On July 29, following another meeting of the Volunteer Department Board, Maurer was fired from his position as fire chief.[61]  The Volunteer Department Board never produced a written report of the results of the investigation that led to Maurer's termination.[62]  Two board members who missed the July 29 meeting requested a report but never received one.[63]

On July 31, Maurer's lawyer wrote a letter requesting a meeting with officials from the Fire District and Independence.[64]

---

[58]    *Id.* at 37.

[59]    *Id.* at 38.

[60]    *Id.* at 39.

[61]    *Id.*

[62]    *Id.* at 40.

[63]    *Id.*

[64]    *Id.* at 41.

Independence did not respond to the letter, but the Fire District's attorney, Clifton Speed, met with Maurer and his lawyer on September 4.[65]

At that meeting, Speed told Maurer and his lawyer that there was no report from the investigation, and that Ragusa's allegations were not the reason that Maurer was fired.[66]  Speed said Maurer had been fired because of three allegations that the complaint terms the "Speed allegations": (1) Maurer "was only sending two firefighters to fire calls;" (2) the Volunteer Department "was never short of money"--Crocker told the Fire District that the Volunteer Department had over $500,000 available; and (3) "two fire engines were broken down for an extended period of time."[67]  Maurer told Speed that these allegations were false.

Ragusa made several derogatory statements about Maurer to the media after Maurer was fired.  For example, Ragusa told the *Daily Star* that he was "afraid the town would lose [its] fire rating," that "what [Maurer] was doing was no way to run the department," and that Maurer had lied about the reason why three firefighters left the Volunteer Department.[68]

---

[65]    *Id.* at 42-43.

[66]    *Id.* at 46.

[67]    *Id.* at 47.

[68]    *Id.* at 43.

15

### III. LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead enough facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff. *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009).

A legally sufficient complaint need not contain detailed factual allegations, but it must go beyond labels, legal conclusions, or formulaic recitations of the elements of a cause of action.  *Id.*  In other words, the face of the complaint must contain enough factual matter to raise a reasonable expectation that discovery will reveal evidence of each element of the plaintiff's claim. *Lormand*, 565 F.3d at 257.  If there are insufficient factual allegations to raise a right to relief above the speculative level, or if it is apparent from the face of the complaint that there is an insuperable bar to relief, the claim must be dismissed. *Twombly*, 550 U.S. at 555.

## IV.  DISCUSSION

### A.  Due Process Claim Under 42 U.S.C. § 1983

Maurer has sued all of the moving defendants under section 1983 for violating his right to procedural due process before being fired.  The Court assesses three threshold challenges to Maurer's section 1983 claim before assessing whether Maurer has adequately alleged a violation of his constitutional rights under the Due Process Clause.

#### 1.  State Action

First, the Volunteer Department defendants contend that Maurer's section 1983 claim against them fails at the threshold because the Volunteer Department--a nonprofit corporation--and its board members are not a state actors and thus may not be sued under section 1983.

To state a claim under 42 U.S.C. § 1983, Maurer must allege that the defendants acted "under color of law" and that the defendants deprived him of his constitutional rights.  *Hey v. Irving*, 161 F.3d 7 (5th Cir. 1998) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970)).  The Supreme Court has adopted at least four different frameworks for determining whether an entity or individual acted on behalf of the state for purposes of affixing section 1983 liability.  *See Yeager v. City of McGregor*, 980 F.2d 337, 339 (5th Cir. 1993).  These include "the exclusive government function concept, the state's encouragement or

18

coercion of private activities, the symbiotic relationship and the entanglements formula." *Id.*

The Volunteer Department argues that, as a domestic corporation, it is not a state actor subject to suit under section 1983.  In *Yaeger*, the Fifth Circuit explained that answering the state action question about a volunteer fire department requires a "fact-specific review" of the "history, tradition and local law surrounding volunteer fire departments." *Id.*  Although the *Yaeger* court determined that the volunteer fire department in that case was not a state actor, it did so only after a fact-specific review.  *Id.*  Because the Court cannot make this sort of fact-specific determination at the motion to dismiss stage, the Court will not dismiss Maurer's section 1983 claim against the Volunteer Department on the ground that the Volunteer Department is not a state actor.  The Volunteer Department is free, however, to reurge this argument at a later stage of the proceedings.

The five members of the Volunteer Department Board--Bahan, Anthony, Tallo, McKinney, and Parazzo--argue that, as private individuals, they are not state actors subject to suit under section 1983.  In their individual capacities, these private defendants may be sued under section 1983 only if they were "willful participant[s] . . . jointly engaged with state officials in the challenged action."  *Dennis v. Sparks*, 449 U.S.

24, 27-28 (1980).  This test generally requires a plaintiff to allege a conspiracy between the private party and the state official or entity.  *See, e.g.*, *id.*; *Hey*, 161 F.3d at 7; *Hobbs v. Hawkins*, 968 F.2d 471, 480 (5th Cir. 1992).

Here, Maurer makes a conclusory allegation that "[a]ll defendants have acted together to violate plaintiff's rights."[69] But Maurer's complaint does not explain what role the individual board members allegedly played in the challenged action: his termination without due process.  He does not, for example, allege that the board took a roll-call vote, and that each board member voted to fire him.  He does allege generally that "individual [Volunteer Department] board members allowed themselves to be bullied into firing the plaintiff."[70]  But the Court cannot infer from this allegation alone that each individual board member had a role in firing Maurer, especially since Maurer never actually alleges that the board was the entity with the power to fire him, or the entity that actually did fire him.  Therefore, the Court dismisses Maurer's section 1983 claim against Bahan, Anthony, Tallo, McKinney, and Parazzo in both their individual and official capacities.

    2.   *Threshold* Monell *Requirements*

---

[69]    R. Doc. 80-4 at 63.

[70]    R. Doc. 80-4 at 62.

Second, Independence and Ragusa contend that Maurer has failed to state a claim under section 1983 against Independence and against Ragusa in his official capacity because Maurer does not allege a pattern or practice that was the moving force behind the alleged constitutional violation.

Municipal liability under section 1983 requires proof of three elements: "(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom." *Pineda v. City of Hous.*, 291 F.3d 325, 328 (5th Cir. 2002) (citing *Piotrowski v. City of Hous.*, 237 F.3d 567, 578 (5th Cir. 2001)).  A suit against a government official such as Mayor Ragusa in his official capacity is the same as a suit against the government entity of which the official is an agent. *See Burge v. Parish of St. Tammany*, 187 F.3d 452, 468 (5th Cir. 1999) (citing *McMillian v. Monroe Cty., Ala.*, 520 U.S. 781, 785 n.2 (1997)).

Here, Maurer alleges no official policy or custom, much less one that was the "moving force" behind his termination. Therefore, the Court dismisses Maurer's section 1983 claim against Independence and against the Mayor in his official capacity.

     *3.   Qualified Immunity*

Third, Mayor Ragusa asserts that he is entitled to qualified immunity from Maurer's section 1983 claim against him in his individual capacity.  "Federal qualified immunity protects government officials performing discretionary functions from civil damages liability." *Shaboon v. Duncan*, 252 F.3d 722, 728-29 (5th Cir. 2001).  Immunity questions should be resolved "at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (citations omitted).  The first step in the qualified immunity analysis is to determine whether the plaintiff has alleged a violation of a "clearly established" constitutional right. *Wooley v. City of Baton Rouge*, 211 F.3d 913, 919 (5th Cir. 2000) (citing *Siegert v. Gilley*, 500 U.S. 226, 231 (1991)).  A right is "clearly established" if the "contours of the right [are] . . . sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 635 (1987)).

Here, Maurer has not pleaded facts sufficient to establish that Ragusa played a causal role in the action that allegedly violated Maurer's Due Process rights: Maurer's firing.  Maurer does not allege that Ragusa employed him, that Ragusa fired him, or that Ragusa forced any other person or entity to fire him.  Maurer does allege that Ragusa wrote a letter to the Fire District accusing Maurer of misconduct and indicating that

22

"Independence would withhold money from its next quarterly payment" because of the misconduct.[71]  Assuming Maurer's account of Ragusa's letter is true, it is plausible that the letter affected the calculus of the entities who did allegedly employ and fire Maurer--the Volunteer Department, the Fire District, and Tangipahoa.  But even if the letter did factor into these entities' decision to fire Maurer, nothing in the letter required them or encouraged them to dismiss Maurer by any particular method.  Thus, Maurer has not alleged any facts causally linking Ragusa to the alleged Due Process violation.  Because the complaint fails to plead sufficient facts to establish that Ragusa violated any clearly established rights, he is entitled to qualified immunity against Maurer's section 1983 claim.

>    4.    *Due Process Violation*

When confronted with a procedural due process claim, a court must determine, first, whether the plaintiff has a property or liberty interest that cannot be taken away without procedural protections; and second, if so, how much process is due.  *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985). Maurer contends that he had a property interest in his employment by virtue of his status as a "fire employee" under the Louisiana Firefighter Bill of Rights and by virtue of his status as a

---

[71]    *Id.* at 26.

classified civil service employee.  The Court addresses each contention in turn.

### *Firefighter Bill of Rights*

The Court begins with Maurer's contention that he had a property interest in his employment by way of a state statute, the Louisiana Firefighter Bill of Rights.  The Louisiana Firefighter Bill of Rights mandates that certain "minimum standards" apply whenever a "fire employee" is under investigation, La. Rev. Stat. § 33:2181(B), and provides that "[a]ny discipline, demotion, dismissal or adverse action of any sort taken against a fire employee without complete compliance with the provisions of [the statute] is an absolute nullity . . . ." La. Rev. Stat. § 33:2181(C).

As the Court held in its earlier order granting the moving defendants' first round motions to dismiss, these provisions do not apply to Maurer because he is not a "fire employee" within the meaning of the statute.[72]  A "fire employee" is defined as "any person employed in the fire department of any municipality, parish, or fire protection district maintaining a full-time regularly paid fire department, regardless of the specific duties of such person within the fire department, and who is under investigation with a view to possible disciplinary action, demotion, or dismissal."  La. Rev. Stat. § 33:2181(A)(1).

---

[72]    R. Doc. 34 at 16.

Maurer's complaint indicated he was employed by the Volunteer Department, a private corporation, and *not* by Independence or the Fire District.[73]  Thus, under the plain terms of the statute, the Firefighter Bill of Rights did not apply to Maurer.

This result remains the correct result.  The Court must interpret this Louisiana statute according to the principles of interpretation followed by Louisiana courts.  *See Gen. Elec. Capital Corp. v. Se. Health Care, Inc.*, 950 F.2d 944, 950 (5th Cir. 1991).  Because there are no Louisiana Supreme Court decisions interpreting the definition of "fire employee" in the Firefighter Bill of Rights, this Court must make an "*Erie* guess" and "determine as best it can" what the Louisiana Supreme Court would decide.  *Krieser v. Hobbs*, 166 F.3d 736, 738 (5th Cir. 1999).  To make an "*Erie* guess" on an issue of Louisiana law, the Court "employ[s] the appropriate Louisiana methodology" to decide the issue the way that it believes the Supreme Court of Louisiana would decide it.  *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 546 (5th Cir. 2004) (quoting *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 197 (5th Cir. 2003)).

In Louisiana, the sources of law are legislation and custom. *Id.*  These authoritative or primary sources of law are to be "contrasted with persuasive or secondary sources of law, such as [Louisiana and other civil law] jurisprudence, doctrine,

---

[73]     *See id.*

25

conventional usages, and equity, that may guide the court in reaching a decision in the absence of legislation and custom." *Id.* (quoting La. Civ. Code art. 1). In Louisiana, "courts must begin every legal analysis by examining primary sources of law: the State's Constitution, codes, and statutes." *Id.* (quoting *Prytania Park Hotel, Ltd. v. General Star Indem. Co.*, 179 F.3d 169, 174 (5th Cir. 1999)). In addition, in Louisiana, "Laws on the same subject matter must be interpreted in reference to each other." La. Civ. Code art. 13. Finally, and important here: "When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature." La. Civ. Code art. 9.

Therefore, the Court begins its analysis with the language of the statute. The Firefighter Bill of Rights provides a precise definition of "fire employee." When, as here, the statute specifically defines the employer-employee relationship, the statute's definition governs. *See Dejoie v. Medley*, 9 So. 3d 826, 829-30 (La. 2009); La. Civ. Code art. 9. Allowing an alternative definition, such as plaintiff's proposed *de facto* employer formula, to compete with the statutory definition would defeat the purpose of privileging the statutory text in the first place.

To meet the statute's definition of a "fire employee," two factors must be met.  A person must be (1) "employed in the fire department of [a] municipality, parish, or fire protection district," and (2) the employing municipality, parish or fire protection district must "maintain[] a full-time regularly paid fire department."  La. Rev Stat. 33:2181(A)(1).  The first element, importantly, does *not* refer to employees of private nonprofit corporations.  Therefore, under the plain terms of the statute, the Firefighter Bill of Rights does not apply to plaintiff.

The Court's conclusion that the Firefighter Bill of Rights does not apply to plaintiff is buttressed by comparing La. Rev Stat. 33:2181 with La. Rev. Stat. §§ 33:1991 and 33:2002, which are also found in the Part of the Louisiana Revised Statutes entitled "Fire Department."  Section 33:1991 contains definitions for the Subpart on minimum wages and maximum hours for firefighters and provides as follows:

> The word "fireman," as used in this Subpart includes all persons employed or engaged full-time by municipalities or municipal fire departments, parishes or parish fire departments,  or  fire  protection  districts  for firefighting or fire prevention duties and services, *as well as employees of nonprofit corporations under contract with a fire protection district or other political subdivision to provide such services*, including operators of the fire-alarm system when such operators are members of the regularly constituted fire department. The  word  "fireman"  does  not  include  carpenters, storekeepers, machinists, clerks, building hazard and similar inspectors, physicians, or other non-firefighting employees detailed for such special duties, nor does the

27

word "fireman," except as otherwise provided in this Subsection, include employees of privately owned or operated firefighting or fire prevention services.

La. Rev. Stat. § 33:1991(A)(1) (emphasis added). Thus, the Louisiana legislature specifically included firefighters employed by nonprofit corporations that contract with political subdivisions to provide fire protection services in the definition of "fireman" in section 33:1991, but it did not specifically include such firefighters in the definition of "fire employee" in the Firefighter Bill of Rights.

Similarly, section 33:2002, which governs supplemental pay for employees of fire departments, specifies in four separate places that it applies to

any municipality, parish, fire protection district, or other political subdivision maintaining a fire department, or by the Chitimacha Tribe of Louisiana or the Coushatta Tribe of Louisiana, hereinafter referred to as "tribe", or by *any nonprofit corporation contracting with any such political subdivision to provide fire protection services.*

La. Rev. Stat. § 33:2002 (emphasis added). Thus, the supplemental pay statute, unlike La. Rev. Stat. § 33:2181, makes clear that it is intended to apply to nonprofit corporations.

Comparing these two statutes with the text of La. Rev. Stat. 33:2181 demonstrates that the Louisiana legislature specifically included "employees of nonprofit corporations" and "nonprofit corporations" in those statutes that it intended to be applicable to nonprofit corporations. It follows that had the legislature

28

intended for the Firefighter Bill of Rights to be applicable to employees of nonprofit corporations contracting to provide fire protection services, it would have specifically included them in the definition of "fire employee" provided in the statute.

*West Virginia University Hospitals, Inc. v. Casey*, 499 U.S. 83 (1991), is instructive in this regard.  There, the Supreme Court held that the term "attorney's fees" in the fee-shifting provision of 42 U.S.C. § 1988 did not include expert witness fees because many other fee-shifting statutes explicitly allowed for shifting of both attorney's fees *and* expert witness fees.  *Id.* at 88-92.  The Court explained that "this statutory usage shows beyond question that attorney's fees and expert fees are distinct items of expense.  If . . . the one includes the other, dozens of statutes referring to the two separately becomes an inexplicable exercise in redundancy."  *Id.* at 92.

So it is here as well.  If a private corporation such as the Volunteer Department was considered to be the "fire department of a[] municipality, parish, or fire protection district" within the meaning of section 33:2181, there would have been no need for the Louisiana legislature to refer separately to "municipal fire departments, parishes or parish fire departments, or fire protection districts," and to "nonprofit corporations under contract with a fire protection district or other political subdivision to provide [fire protection] services" in section

29

33:1991.  Nor would there have been need for it to refer
separately to "any municipality, parish, fire protection
district, or other political subdivision maintaining a fire
department" and "any nonprofit corporation contracting with any
such political subdivision to provide fire protection services"
in section 33:2002.  *See* La. Civ. Code art. 13 ("Laws on the same
subject matter must be interpreted in reference to each other.");
*cf*. *Casey*, 499 U.S. at 101 (courts should not "treat alike
subjects that different Congresses have chosen to treat
differently"); *Pa. Dep't of Public Welfare v. Davenport*, 495 U.S.
552, 562 (1990) (expressing "a deep reluctance to interpret a
statutory provision so as to render superfluous other provisions
in the same enactment").

   Moreover, in making an *Erie* guess in the absence of a ruling
from the state's highest court, federal courts may look to the
decisions of intermediate appellate state courts for guidance.
*See Howe ex rel. Howe v. Scottsdale Ins. Co.*, 204 F.3d 624, 627
(5th Cir. 2000) (citing *Matheny v. Glen Falls Ins. Co.*, 152 F.3d
348, 354 (5th Cir. 1998)).  Louisiana's intermediate appellate
court decisions provide "a datum for ascertaining state law which
is not to be disregarded by a federal court unless it is
convinced by other persuasive data that the highest court of the
state would decide otherwise."  *Id.* (citing *Labiche v. Legal Sec.
Life Ins. Co.*, 31 F.3d 350, 351 (5th Cir. 1994)).  At present,

30

only the Louisiana Fifth Circuit Court of Appeal has decided the issue of whether employees of non-profit corporations under contract with a fire protection district to provide fire protection services are "fire employees" within the meaning of the Firefighter Bill of Rights.  That court held that they were not, employing a similar statutory analysis to the Court here. *See Marks v. Third Dist. Volunteer Fire Dep't*, 131 So. 3d 1099 (La. Ct. App. 2013).

Applying Louisiana principles of statutory construction, the Court concludes that the text of La. Rev. Stat. § 33:2181 is clear and unambiguous, and its inapplicability to plaintiff may be determined as a matter of law.  Thus, the Court need look no further than the text of the statute to conclude that the protections of the Louisiana Firefighter Bill of Rights do not apply to Maurer.

### *Civil Service Protection*

The Court next addresses Maurer's contention that he has a property interest in his employment by way of the protections of the Louisiana classified civil service system.  The Louisiana Constitution provides that all municipalities and fire protection districts operating a "regularly paid fire department" must establish a classified civil service system.  La. Const. art. 10 § 16.  A state statute, La. Rev. Stat. § 33:2541, lists the positions deemed classified within fire protection districts.  It

31

includes all fire department positions for which "the right of employee selection, appointment, supervision, and discharge is vested in the government of the municipality, parish or fire protection district . . . under which the fire . . . service functions."  La. Rev. Stat. § 33:2541.

Therefore, Maurer's entitlement to classified civil service protections turns on two questions: (1) whether Tangipahoa Parish or the Fire District "operated" a full-time, regularly paid fire department, and (2) whether Tangipahoa and/or the Fire District retained "the right of employee selection, appointment, supervision, and discharge" over Maurer.

The Courts begin with the second question, which it did not reach during the last round of motions to dismiss.  Two documents attached to or incorporated by reference into Maurer's second amended complaint support the inference that the Fire District did retain "the right of employee selection, appointment, supervision, and discharge" over Maurer.  First, Maurer attaches his "Approval to Hire" form.[74]  The form is labeled "Tangipahoa Parish Rural Fire #2 Position Requisition/Approval to Hire Form."  Maurer asserts that this form supports his allegation that the Fire District had a "long-standing practice" of requiring all volunteer fire departments, including the Volunteer Department, to "submit all employment decisions such as new hires,

---

[74]     R. Doc. 80-6, Ex. 6.

promotions, appointments, and changes in rates of pay" to the
Fire District for approval.[75]  Maurer also alleges that on
December 5, 2012, the Fire District "approved the
appointment . . . of [Maurer] as Chief."[76]  Likewise, the
complaint alleges that after the Volunteer Department voted to
hire all of the former Independence Fire Department employees as
Volunteer Department employees, the Fire district "approved" the
plan.[77]

Maurer further alleges that the Fire District has the
authority to "investigate the alleged misconduct of fire
employees," "appoint an individual to conduct an investigation,"
and to "schedule meetings with . . . elected officials to receive
complaints against fire employees," and to "orchestrate the
removal of any fire employee."[78]  Maurer's factual allegations
about the investigation into his own performance plausibly
support the inference that the Fire District retained the
authority to supervise, investigate, and discharge employees of
the Volunteer Department.

Second, Maurer incorporates by reference the 2013 blanket
contract between the Fire District and the volunteer fire

---

[75]    R. Doc. 80-4 at 53.

[76]    *Id.* at 9.

[77]    *Id.* at 10.

[78]    *Id.* at 58.

departments in its jurisdiction.[79]  The contract provides that all departments "contracted with the District shall be required to strictly comply with the policies and procedures adopted by the Board of Commissioners of the District."[80]  The policies and procedures in turn contain an organizational chart.[81]  On the chart, the Fire District appears at the top.  Beneath the Fire District appears the "Fire Administrator" and beneath the "Fire Administrator" appears each of the volunteer fire departments, including the Independence Volunteer Department.  This document provides additional support for Maurer's allegation that the Fire District retained supervisory control over him and his department.  Taking these allegations and documents together, the Court concludes that Maurer has plausibly alleged that his position as fire chief would qualify for the classified civil service.

The remaining question then is whether the Fire District needed to establish a classified civil service at all.  The Fire District needed to establish a classified civil service only if it "operated" a full-time, regularly paid fire department.  An opinion on point by the Louisiana Supreme Court, *Marshall v. W.*

---

[79]   *See id.* at 6 (incorporating 2013 contract by reference); R. Doc. 78 (2013 contract).

[80]   R. Doc. 78 at 4.

[81]   *Id.* at 22.

*Baton Rouge Parish Fire Prot. Dist. No. 1*, 998 So. 2d 85, 85 (La. 2009), indicates that the question whether a parish or district "operated" a regularly paid fire department is a factual one.  In *Marshall*, a former employee of a volunteer fire department contended that, as a classified civil service employee, he was entitled to a hearing before being terminated.  *See* La. Rev. Stat. § 33:2561.  Under the statute, if the local Fire Protection District "operated" his fire department, then Marshall would be entitled to a hearing; if not, then not.  According to the Louisiana Supreme Court, the question whether the Fire Protection District operated the fire department turned on two "factual issues": "what actions constitute the operation of a regularly paid fire department" and "what entity actually employed plaintiff."  *Id.*  Thus, the Supreme Court remanded the case for the trial court "to take evidence, hear testimony, and make factual findings regarding what entity employed Mr. Marshall and what entity operates the fire protection services in the City of Port Allen."  *Id.*

    This approach is consistent with *Heintz v. City of Gretna*, 683 So. 2d 926, 928 (La. Ct. App. 1996), in which the Louisiana Fifth Circuit assessed whether the city "operated" a regularly paid fire department.  Although the *Heintz* court concluded that contracting with a volunteer fire department did not constitute operation of a regularly paid fire department, it did so after

analyzing the specific factual situation. The Court concludes that, in light of *Marshall*, the question whether Tangipahoa Parish or the Fire District "operates" a full-time, regularly paid fire department requires the development of a factual record. Therefore, it is not appropriate for resolution on a motion to dismiss. Maurer's complaint, together with the documents incorporated by reference into the complaint, allege enough to plausibly raise this issue. In particular, as discussed above, his complaint incorporates by reference the 2013 blanket contract between the Fire District and the volunteer fire departments in its jurisdiction.[82] While this document is not conclusive on the issue, it provides enough factual content to make plausible Maurer's allegation that the Fire District "operated" a regularly paid fire department. Thus, Maurer may support his Due Process claim at this time with an alleged entitlement to civil service protection. His Due Process claim can go forward.

**B. Violation of the Whistleblower Law**

Independence and Mayor Ragusa move the Court to dismiss again Maurer's claim against them for violations of Louisiana's "Whistleblower Law," which provides as follows:

---

[82] R. Doc. 80-4 at 6 (incorporating 2013 contract by reference); R. Doc. 78 (2013 contract).

> A. An employer shall not take reprisal against an employee who in good faith, and after advising the employer of the violation of law:
> (1) Discloses or threatens to disclose a workplace act or practice that is in violation of state law.
> (2) Provides information to or testifies before any public body conducting an investigation, hearing, or inquiry into any violation of law.
> (3) Objects to or refuses to participate in an employment act or practice that is in violation of law.

La. Rev Stat. § 23:967.

By its plain terms, the law provides protection to employees against reprisal from their *employers*. Maurer alleges that his employment with Independence ceased on January 1, 2013, when Independence closed its fire department and the Volunteer Department immediately hired Independence's former employees.[83] Thus, Independence did not employ Maurer at the time of the events that form the basis of Maurer's Whistleblower Law claim. And Maurer does not allege that Mayor Ragusa ever employed him. Because Independence and Ragusa did not employ Maurer, he cannot bring a claim against them under the La. Rev. Stat. § 23:967.

Maurer argues in his opposition that he is also entitled to the protections of La. Rev. Stat. § 42:1169, which provides whistleblower protection to public employees who report violations, or alleged violations, of the Code of Governmental Ethics to the Louisiana Board of Ethics. He attaches to his

---

[83]    R. Doc. 80-4.

opposition a letter to the Ethics Board dated April 24, 2014.[84]
He also seeks leave to file a letter from the Ethics Board dated
May 22, 2014, which indicates that the Board received Maurer's
April 24 letter.[85]

Here, the Court need not determine whether Maurer is a
public employee entitled to the protections of La. Rev. Stat.
§ 42:1169, because jurisdiction to enforce the Code of
Governmental Ethics lies only in the Board of Ethics. *Collins v.
State ex rel. Dep't of Natural Res.*, 118 So. 3d 43, 47-48 (La.
Ct. App. 2013); *Nolan v. Jefferson Parish Hosp. Serv. Dist. No.
2*, 790 So. 2d 725, 732 (La. Ct. App. 2001) (citing La. Rev. Stat.
§ 42:1132(C)); *see* La. Rev. Stat. § 42:1132(C) ("The board shall
administer and enforce the provisions of this Chapter and the
rules, regulations, and orders issued hereunder with respect to
public employees and elected officials.").  The statute does not
create a private right of action. *Nolan*, 790 So. 2d at 732 ("We
find no provision for any private right of action under the Code
of Governmental Ethics; the employee's remedy is to complain to
the Board of Ethics, which then investigates and takes action to
protect the employee, if appropriate.")  Thus, Maurer may not
bring a claim under La. Rev. Stat. § 42:1169.

---

[84]     R. Doc. 49-1.

[85]     R. Doc. 62.

38

Maurer's Whistleblower Law claims are dismissed.  In addition, because the May 22 Ethics Board letter is irrelevant to Maurer's other claims, the Court denies his motion for leave to file the letter.

### C.   Defamation Claim

Maurer has deleted his defamation claims against all of the defendants but Mayor Ragusa.[86]  To state a claim for defamation, Maurer must allege four elements: "(1) a false and defamatory statement concerning another; (2) an unprivileged communication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury." *Costello v. Hardy*, 864 So. 2d 129, 139 (La. 2004) (quoting *Trentecosta v. Beck*, 703 So. 2d 552, 559 (La. 1997)).  To plead adequately, he must "set forth . . . with reasonable specificity the defamatory statements allegedly published by the defendant." *Badeaux v. Sw. Computer Bureau, Inc.*, 929 So. 2d 1211, 1218 (La. 2006).

Defamatory words are defined as "words which tend to harm the reputation of another so as to lower the person in the estimation of the community, to deter others from associating or dealing with the person, or otherwise expose a person to contempt or ridicule." *Costello*, 864 So. 2d at 140.  Words that "convey an element of personal disgrace, dishonesty, or disrepute" are defamatory. *Id.* (citation omitted).  The question whether a

---

[86]     R. Doc. 80-1 at 1.

particular communication is capable of a defamatory meaning is a legal one for the Court, "answered by determining whether a listener could have reasonably understood the communication, taken in context, to have been intended in a defamatory sense." *Id.*

Here, Maurer alleges that Ragusa made false and defamatory statements to third parties on several occasions. The complaint includes a number of defamatory statements Ragusa allegedly made to the press, but the best examples come from a letter that Ragusa allegedly sent to the Fire Department. According to Maurer, the letter accused him of various misconduct including, among other things, (1) "fail[ing] to properly inventory and maintain fire equipment" and (2) receiving a check for $2500 that should have gone to Independence, depositing the check "into an account other than a Town of Independence account," and "refus[ing] to repay the money after demand had been made."[87]

The facts alleged in Maurer's complaint indicate that both accusations were false. As Maurer tells it, when he took over as chief, the inventory he received included only major items--the "thermal imaging camera," some furniture, and the two Mack fire trucks--and the information he received from the town was dismally "inaccurate, outdated, and incomplete."[88]  Maurer

---

[87]    R. Doc. 80-4 at 26-27.

[88]    *Id.* at 23-24.

alleges that he prepared an inventory as best he could and submitted it to Ragusa but never heard back.[89]

Likewise, Maurer's complaint provides an explanation of the $2500 check. According to Maurer, the Volunteer Department had paid $2500 for Austin Davis, a former employee of the Volunteer Department, to attend the LSU Firefighting School, conditional on Davis remaining employed with the Volunteer for at least two years.[90] When Davis left before the two years was up, he refunded the tuition.[91] At the time, Crocker, not Maurer, was chief of the Volunteer Department, and it was *Crocker* who had the money deposited in the Volunteer Department account. Maurer met with Ragusa and explained what had happened with the money, showed Ragusa "copies of the bank statement and the check," and agreed to repay the money. Ragusa allegedly told Maurer "that was fine" and gave him until the end of the year to repay the money. The facts alleged thus provide grounds for inferring that Ragusa's statements about the inventory and about the $2500 check were false.

The statements are also capable of defamatory meaning. The statements suggest that Maurer, as fire chief, did not keep careful records of town assets and misappropriated town funds.

---

[89]    *Id.* at 24.

[90]    *Id.* at 32.

[91]    *Id.*

41

The words thus easily "convey an element of . . . dishonesty" and are the sort that would tend to harm Maurer's reputation and the "estimation [of him] in the community." *Costello*, 864 So. 2d at 140.

Maurer further alleges that these statements were conveyed in a letter to the Fire District, which satisfies the requirement that the false and defamatory statements be published to a third party. He also alleges that Ragusa's defamatory statements caused him actual damages including, among other things, "loss of employment," which is supported by his factual allegations.[92]

Because Maurer has adequately alleged that a false statement capable of defamatory meaning was published to a third party and caused him damages, only the question of fault remains. A negligence standard of fault applies when a private individual sues a non-media defendant, regardless of whether the allegedly defamatory statements concern public or private matters. *See Kennedy v. Sheriff of E. Baton Rouge*, 935 So. 2d 669, 680 (La. 2006). Under the negligence standard, a defendant acts with fault if he acts with "a lack of reasonable belief in the truth of the statement giving rise to the defamation." *Costello*, 864 So. 2d at 140. If the plaintiff is a public figure, an "actual malice" standard applies. *Id.* at 140-41. A defendant acts with "actual malice" if he either knows a defamatory statement is

---

[92]     *Id.* at 67.

false or acts "with reckless disregard for the truth." *Id.* at 141.

Here, the Court need not decide if Maurer, as fire chief, qualifies as a limited public figure or not because his complaint alleges facts sufficient to satisfy even the actual malice standard of "reckless disregard." In *Trentecosta*, 703 So. 2d 552, the Louisiana Supreme Court explained that the "reckless disregard" standard is met when a defendant makes a statement capable of defamatory meaning "despite [his] awareness of probable falsity." *Id.* at 561 (quoting *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 153 (1967)). Reckless disregard also encompasses statements "fabricated by the defendant or a product of the defendant's imagination," such as when a defendant "d[oes] not obtain [his] information from any source, reliable or otherwise." *Id.* at 562.

Here, Maurer's allegations support the inference that Ragusa had reason to doubt the truth of the statements he allegedly wrote in the letter. Maurer alleges that he spoke with Ragusa about both the inventory and the $2500 check, and that he provided Ragusa with paper records verifying his account in both instances. It is not plausible that Ragusa could have seen these records and heard Maurer's explanations and yet remain unaware of the "probable falsity" of his statements. Taking Maurer's

43

allegations as true, the Court concludes that the complaint states a claim for defamation.

In his defense, Ragusa argues that Louisiana's discretionary function immunity statute, La. Rev. Stat. 9:2798.1, shields him from any potential liability for defamation and thus entitles him to dismissal of Maurer's defamation claim.  The statute immunizes public entities for policy making or discretionary acts within the scope of their lawful powers.  *Simeon v. Doe*, 618 So. 2d 848, 856 (La. 1993).  Ragusa bears the burden of proving that he is entitled to discretionary function immunity.  *See id*.  To establish his entitlement to the immunity, Ragusa needs to show not only that he had discretion to act, but also that the discretion was "grounded in social, economic or political policy."  *Hardy v. Bowie*, 744 So. 2d 606, 613 (La. 1999).

In the context of a Rule 12(b)(6) motion to dismiss, dismissal on the basis of an affirmative defense is appropriate only if the defense appears on the face of the complaint.  *See EPCO Carbon Dioxide Prods., Inc. v. J.P. Morgan Chase Bank, N.A.*, 467 F.3d 466, 470 (5th Cir. 2006).  Here, the defense is not evident from the face of the complaint.  Ragusa conclusorily invokes the defense with no specifics on how discretionary function immunity is satisfied on the facts alleged by Maurer. Thus, discretionary function immunity does not provide a ground

for dismissal at this time.  Maurer may proceed with his
defamation claim.

**V.   CONCLUSION**

The Court GRANTS Maurer's motion for leave to file his
second amended complaint.[93]  The Court DENIES his motion for
leave to file his acknowledgment letter from the Louisiana Board
of Ethics.[94]

The Court GRANTS the motions to dismiss[95] in part and DENIES
them in part.

The Court dismisses Maurer's section 1983 claim against:

- Mayor Ragusa in his individual and official capacity;

- Independence; and

- Jeremy Baham, Eric Anthony, Jonathan Tallo, Christopher
  McKinney, and Anthony Parrozzo in their individual and
  official capacities.

Maurer may proceed against the Volunteer Department with his
section 1983 due process claim grounded in the protections of the
Louisiana classified civil service, but the Court dismisses
Maurer's section 1983 due process claim grounded in the
Firefighter Bill of Rights.

---

[93]   R. Doc. 80; R. Doc. 90.

[94]   R. Doc. 62.

[95]   R. Doc. 43; R. Doc. 44.

45

The Court dismisses Maurer's Whistleblower Law claims against Ragusa and Independence.

Maurer may proceed with his state law defamation claim against Ragusa.

Because this order resolves all of Maurer's claims against Independence and against Baham, Anthony, Tallo, McKinney, Parrozzo, the Court dismisses these defendants from the case.

New Orleans, Louisiana, this 2nd day of March, 2015.

_____

SARAH S. VANCE

UNITED STATES DISTRICT JUDGE